UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

FILED - CLERK
U.S. DISTRICT COURT
2005 APR -4 PM 2: 59
TX EASTERN-BEAUMONT
BY _____

| | |
|---|---|
| Finisar Corporation, a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>The DirecTV Group, Inc., a Delaware Corporation; DirecTV Holdings, LLC, a Delaware Limited Liability Company; DirecTV Enterprises, LLC, a Delaware Limited Liability Company;  DirecTV Operations, LLC, a California Limited Liability Company; DirecTV, Inc., a California Corporation; and Hughes Network Systems, Inc., a Delaware Corporation,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Cause No. 1 05CV 0264

JURY TRIAL DEMANDED

**COMPLAINT FOR PATENT INFRINGEMENT**

---

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Finisar Corporation ("Finisar") hereby alleges and complains as follows:[1]

### PARTIES

1.    Finisar is a Delaware Corporation with a principal place of business at 1308 Moffett Park Drive, Sunnyvale, California 94089.

2.    Defendant The DirecTV Group, Inc. (f/k/a Hughes Electronics Corporation) is a Delaware corporation.  DirecTV Holdings, LLC and DirecTV Enterprises, LLC are Delaware limited liability companies.  Defendant DirecTV Operations, LLC is a California limited liability

---

[1] The section headings included herein are not intended to form part of Finisar's express allegations.

company and DirecTV, Inc. is a California corporation.   The foregoing defendants are collectively referred to herein as "DirecTV."

3.   On information and belief, DirecTV has a principal place of business at 2230/2250 East Imperial Highway, El Segundo, California 90245.

4.   Defendant Hughes Network Systems, Inc. ("Hughes") is a Delaware corporation and a subsidiary of The DirecTV Group, Inc.

5.   On information and belief, Hughes has a principal place of business at 11717 Exploration Lane, Germantown, Maryland 20876.

## JURISDICTION

6.   This is a civil action brought by Finisar for patent infringement committed by defendants and arising under the patent laws of the United States, specifically, Title 35 U.S.C. §§ 271, 281, 283, 284 and 285.   Jurisdiction of this Court is founded upon 28 U.S.C. §§ 1331 and 1338(a).

## VENUE

7.   Venue in the Eastern District of Texas is proper pursuant to 28 U.S.C. §§ 1391(b), (c) and 1400(b), in that a substantial part of the events giving rise to Finisar's claims occurred in this district, the defendants may be found and/or reside in this district by virtue of their activities in this district, and the defendants have committed acts of patent infringement in this district.

## BACKGROUND

**Finisar and Its Founders**

8.   Finisar is a technological leader in fiber optic subsystems and network performance test systems that enable high-speed data communication for networking and storage applications

2

over Gigabit Ethernet local area networks, Fibre Channel storage area networks, and metropolitan area networks using both IP and SONET/SDH-based protocols.

9.   Finisar was founded by Dr. Frank Levinson and Jerry Rawls. It was incorporated in April of 1987 in California and began operations in Menlo Park, California on February 22, 1988. Finisar was later reincorporated in September of 1999 in Delaware.

10.   Finisar had a very successful public offering on November 11, 1999, receiving net proceeds of $151 million from the initial public offering and $190.6 million from an additional public offering on April 7, 2000.

11.   Before founding Finisar, Dr. Levinson worked as a principal optics scientist at Raychem Corporation and Optical Department Manager at Raynet, Inc. Dr. Levinson obtained a B.S. in Mathematics/Physics from Butler University and a M.S. and Ph.D. in Astronomy from the University of Virginia. Dr. Levinson presently resides in Indiana and is Chairman and Chief Technical Officer of Finisar.

12.   Before founding Finisar, Jerry Rawls held various management positions at Raychem Corporation including Manager of Product Marketing, National Sales Manager, General Manager of Aerospace Product Division and General Manager of the Interconnection Systems Division. Mr. Rawls obtained a B.S. in Mechanical Engineering from Texas Tech University ("Texas Tech") and a M.S. in Industrial Administration from Purdue University. Mr. Rawls presently resides in Northern California and is the President and Chief Executive Officer of Finisar.

13.   In recognition of his involvement and contributions to Texas Tech, Texas Tech named its College of Business Administration and golf course after Mr. Rawls.

14.   At its inception, Finisar had little capital, relying principally on financing secured by mortgages on Dr. Levinson's and Mr. Rawl's homes.  Finisar's first headquarters was a small, 1,400 square foot Quonset hut that was furnished with an old couch, a used desk, an old chair, a couple of benches, a fax machine, and a copy machine.

15.   During its first few years of operation, Finisar survived by providing contract engineering work, earning $350,000 in revenue in its first year.

16.   One of Finisar's early customers, Explore Technology (now Burst.com), asked Finisar to develop a prototype of a product that could be demonstrated at the January 1991 Consumer Electronics Show ("CES") in Las Vegas, Nevada.

17.   Finisar agreed and began developing the desired product, an audio or video server capable of bursting data to the client at faster than real-time rates.

18.   Finisar completed two prototypes just in time to load the devices into a rented van and drive to Las Vegas for the January 1991 show.  The prototypes drew considerable attention at the 1991 CES with the *Christian Science Monitor* reporting that "[t]he technology has the capacity to revolutionize the transmission and reception of programming for broadcast and cable operators."

19.   During the course of the Explore Technology project, Finisar learned that Explore Technology was funded, in part, by the Irish rock band U2.  Finisar later demonstrated the technology to U2 first hand while U2 was in concert in Northern California.

20.   Today, Finisar has expanded into a multinational company encompassing several divisions.

21.   Two Finisar divisions are located in Texas.  These divisions are doing business as Medusa Labs and Advanced Optical Components (or AOC).

22.   Medusa Labs tests its customers' products to ensure that they will survive the demands of their respective applications.  It also provides training on Fibre Channel, storage area networks, and other emerging technologies.  Medusa Labs is located in Austin, Texas.

23.   Advanced Optical Components develops, manufactures, and markets vertical cavity surface emitting lasers and detectors that are primarily used in high-speed fiber optic data communications and sensing applications.   Advanced Optical Components is located in Richardson, Texas.

24.   Finisar employs approximately 200 employees at these Texas divisions.

**The Patented Technology**

25.   During Finisar's early years, Dr. Levinson began thinking about distribution of a large database, including video and audio, to a larger subscriber base.

26.   This was the catalyst that sparked Dr. Levinson's desire to develop a system that could deliver a large amount of information to numerous subscribers, requiring only a modest amount of bandwidth.

27.   Dr. Levinson's goal was to engineer a system that was unlike any other system available at the time.

28.   By November of 1991, Dr. Levinson filed a patent application on information broadcasting systems and methods capable of providing a large group of subscribers access to a large amount of information.  This technology is disclosed and claimed in United States Patent No. 5,404,505 ("the '505 patent").

29.  Finisar is the owner by assignment of the entire right, title, and interest in and to the '505 patent, a true and correct copy of which is attached hereto as Exhibit A.

30.  The '505 patent generally addresses the transmission or broadcasting of digital information to a wide base of subscribers, and methods and systems for providing access by many subscribers to a large amount of information and/or programming material.

31.  In one implementation, the technology of the '505 patent can be used in a system that includes a program supplier which stores an information database and tags all the information in the entire database with indices so as to form a single hierarchical structure which encompasses the entire information database.

32.  In such a system, portions of an information database are transmitted often in order to provide the basic subscriber with information.  The information provided by the basic subscriber service is available to all subscribers.

33.  By using a tiered system for scheduling transmission of the information included in the basic subscriber service of this embodiment, the '505 patented technology provides a huge number of subscribers with reasonably quick access to the contents of the large database, even though only a modest amount of bandwidth is used.

34.  In such an embodiment, data is transmitted over a satellite channel and is received by subscriber receiving stations that receive the incoming data stream and select those data packets that meet selection criteria defined by the receiving station.

35.  Selected portions of the information database in such an embodiment are divided into a prioritized set of tiers, wherein all the selected portions of the information database in each

tier are transmitted at a corresponding repetition rate, wherein the repetition rate for higher priority tiers is higher than the repetition rate for lower priority tiers.

36. This technology finds a wide range of applications, including, *inter alia*, transmission of audio and video data, non-video information, and electronic program guides for providers of audio and video programming and transmission through, for example, direct broadcast satellite, local area networks and cable.

37. During the time Dr. Levinson invented the technology of the '505 patent, Finisar also developed other technologies, primarily in the optoelectronic device industry. Since its inception, Finisar was the first to market with, among other products, transceivers with digital diagnostics, SFP transceivers and CWDM GBIC transceivers. Today Finisar is a leader in gigabit fiber optic solutions for high-speed data networks. In 2003 Finisar received the "Optical Components Supplier of the Year Award" from networking giant, Cisco Systems, Inc. As a technology leader, Finisar has 242 issued U.S. Patents with 669 pending patent applications, and continues to innovate in a number of technologies.

38. Like Finisar's other groundbreaking technologies, the pioneering invention of the '505 patent was well before its time. Although Finisar did not ultimately commercialize the technology of the '505 patent, it did seek to license the '505 patent to potential technology partners. One of these potential partners was Hughes Telecommunications and Space Co. ("Hughes Telecom") a former subsidiary of Hughes Electronics Corporation, the latter now as defendant The DirecTV Group, Inc. ("DirecTV Group").

**DirecTV's Notice of the '505 Patent**

39.   In May of 1997, Finisar wrote to Hughes Telecom, advising it of the '505 patent and offering Hughes Telecom an opportunity to work with Finisar in commercializing the inventions of the '505 patent.

40.   On information and belief, although Hughes Telecom and its parent, now DirecTV Group, had actual knowledge of the '505 patent and Finisar's efforts to interest Hughes Telecom as a licensing partner, within two years DirecTV Group filed a provisional patent application that was subsequently converted into United States Patent Application No. 09/515,184 entitled "Carousel Bit Mask System and Method" (the "DirecTV '184 Application," a true and correct copy is attached hereto as Exhibit B). The DirecTV '184 Application disclosed and claimed subject matter generally relating to a broadcast system such as direct-to-home satellite system transmitting program guide information for different time periods on different carousels and on all transponders.

41.   In an Office Action dated February 11, 2003 (a true and correct copy is attached hereto as Exhibit C), the United States Patent and Trademark Office ("PTO") examiner assigned to review the DirecTV '184 Application notified DirecTV Group that all of the claims of the DirecTV '184 Application had been rejected as obvious in light of the prior art.

42.   In a telephonic interview between the representatives of DirecTV Group and the PTO examiner conducted on May 20, 2003, the prosecuting attorneys distinguished over the prior art by claiming that the point of novelty of the DirecTV '184 Application was a repeated repetition rate for broadcasting desired information, stating that the claims would be amended to include the language: "transmitting information with differing periodicity."

43. The DirecTV Group then responded to the Office Action on July 2, 2003 by filing amended claims (a true and correct copy is attached hereto as Exhibit D). The amended claims contained language such as "a first carousel of electronic program guide information that repeatedly broadcasts a first set of electronic program information with a first periodicity and a second carousel of electronic program guide information that repeatedly broadcasts a second set of electronic program guide information with a second periodicity," and "wherein the first program data is repeatedly broadcast at a first periodicity" and "wherein the second program data is repeatedly broadcast at a second periodicity different from the first periodicity."

44. DirecTV Group, in the remarks accompanying the amended claims, stated that "none of the [prior art] disclose[s] or suggest[s] repeating first and second program guide information with first and second periodicies [sic], or acquiring the same. Accordingly, no combination of these references can render obvious claims 1, 11 and 15, or any claims dependent thereon." (Exhibit D, at 5–6.)

45. On information and belief, these arguments were submitted to the PTO by DirecTV Group despite its knowledge of Finisar's '505 patent, which discloses and claims transmission of data at differing repetition rates.

46. After considering the amended claims, the PTO examiner issued a Notice of Allowability, allowing all the claims of the DirecTV '184 Application. The DirecTV '184 Application subsequently issued on December 2, 2003 as United States Patent No. 6,658,661 B1 ("the DirecTV '661 patent") (a true and correct copy is attached hereto as Exhibit E).

**The Defendants**

47.   On information and belief, the defendants are affiliates of one another and work in concert to provide direct broadcast satellite ("DBS") service to subscribers throughout the United States, with over 13.5 million subscribers in the United States.   The DBS service that DirecTV and Hughes offer includes, *inter alia*, video and audio programming and an interactive electronic program guide (collectively "DirecTV programming") transmitted directly to individual subscribers for display on television sets.

48.   On information and belief, DirecTV programming includes distribution to DirecTV's U.S. customers of "more than 1,200 digital video and audio channels, including about 130 basic entertainment channels, 31 premium movie channels, over 35 regional and specialty sports networks, an aggregate of over 1,000 local channels, over 50 Spanish and Chinese language special interest channels, up to 55 pay-per-view movie and event choices, . . . seven high-definition television channels," and continued enhancement of its electronic program guide. (The DirecTV Group, Inc. Form 10-K filed 3/01/05, at 4, 6, a true and correct copy of cited pages is attached hereto as Exhibit F.)   Among other things, the electronic program guide is the means by which a subscriber can determine what each channel is showing at any particular time.

49.   On information and belief, The DirecTV Group, Inc. is a world-leading provider of digital television entertainment, broadband satellite networks and services, and global video and data broadcasting.   (DirecTV: About Us, *available at,* http://www.directv.com/DTVAPP/aboutus /Investor.dsp, a true and correct copy is attached hereto as Exhibit G.)

50.   On information and belief, DirecTV Holdings, LLC is a wholly-owned subsidiary of The DirecTV Group, Inc. and provides its customers with access to hundreds of channels of

digital-quality video and audio programming that are transmitted directly to its customers' homes or businesses via high-powered geosynchronous satellites. (DirecTV Holdings, LLC Form 10-K filed 3/17/04, at 2, 3, a true and correct copy of cited pages is attached hereto as Exhibit H.)

51.   On information and belief, DirecTV Enterprises, Inc. is a wholly-owned subsidiary of DirecTV Holdings, LLC and operates the DirecTV direct broadcast satellite service, the nation's largest such service. (Department of Justice Press Release of 10/31/02, a true and correct copy is attached hereto as Exhibit I.)

52.   On information and belief DirecTV Operations, LLC is a wholly-owned subsidiary of DirecTV Enterprises, LLC and owns, operates, and maintains the DirecTV uplink centers located in Castle Rock, Colorado and Los Angeles, California. *Satellite Broadcasting & Communications Assoc. of Am. v. FCC*, No. 00-1571, Complaint for Declaratory and Injunctive Relief, at 9 (E.D. Va. Sep. 20, 2000), a true and correct copy is attached hereto as Exhibit J.

53.   On information and belief, DirecTV, Inc. is a wholly-owned subsidiary of DirecTV Enterprises, LLC and holds itself out as the nation's leading and fastest-growing digital television service provider. (DirecTV Press Release of 2/7/2005, a true and correct copy is attached hereto as Exhibit K.)

54.   On information and belief, Hughes Network Systems is a subsidiary of The DirecTV Group, Inc. and has previously been one of the two largest manufacturers of DirecTV set-top receivers. (The DirecTV Group, Inc. Form 10-Q filed 5/06/04 at 26, a true and correct copy of cited pages is attached hereto as Exhibit L.)

55.   Together, DirecTV and Hughes operate and/or make available uplink transmission facilities, geosynchronous satellites, home satellite dishes and receivers which enable subscribers

to view over 1,200 channels of programming and an electronic program guide which provides summary information about the programming content available to these subscribers.

56.   On information and belief, equipment to receive DirecTV programming is available for purchase and has been sold within the Eastern District of Texas.

57.   On information and belief, subscriptions to receive DirecTV programming are offered for sale and have been sold within the Eastern District of Texas.

58.   On information and belief, individual subscribers have purchased subscriptions to receive DirecTV programming within the Eastern District of Texas and actually do receive DirecTV programming within the Eastern District of Texas pursuant to those subscriptions.

59.   On information and belief, all individual subscribers, including those residing in the Eastern District of Texas, receive an electronic program guide as part of their DirecTV subscription.

**The Electronic Program Guide**

60.   An electronic program guide ("EPG") is an interactive onscreen directory that lists available channels and scheduled programming information for locating programs amongst the thousands offered each day.

61.   Other possible EPG functions include, *inter alia*, access to user help, parental filtering controls, a means to order pay-per-view programming, the system setup functions, the ability to build personal lists of favorite channels, and short summaries for each program including ratings and background information on actors, directors, etc.

62.   A subscriber can access the EPG by pushing a button on a remote control device. Once the EPG appears on the screen, the subscriber can either scroll through the listing of

available programming and select which program to watch, or the subscriber can access the other functions of the EPG.

63.   The EPG has been described as an essential part of the satellite television provider's service.   Indeed, the EPG has been described as "just about the only way for consumers to efficiently manage all that content" that is delivered by satellite television providers.   Jimmy Schaeffler, *EPGs: Satellite's Answer to Competition,* SATELLITE NEWS, Sept. 9, 2002, at 2, a true and correct copy is attached hereto as Exhibit M.

64.   Further, Thomson Consumer Electronics' vice president of interactive television is quoted as having stated that today's EPGs are "inseparable from a MVPD (multichannel video programming distributors) system." *Id.* at 3.

65.   DirecTV considers the EPG an integral part of its television package.   In fact, Dave Baylor, DirecTV's executive vice president for technology and operations is quoted as having stated, "[i]ncluding our local channels, DirecTV today carries nearly 750 channels.   It would be tough for our customers to navigate without an EPG, and that would certainly have an affect on our service." *Id.* at 1.

66.   In its most recent form 10-K, filed on March 1, 2005, DirecTV Group represented that "DirecTV U.S. believes [it's EPG] is essential for customers to be able to navigate easily through the hundreds of channels that it offers.   In 2004, DirecTV U.S. introduced an improved on-screen electronic program guide with enhanced features for viewing, navigating and searching for programs.   DirecTV U.S. intends to continue to improve the electronic program guide by periodically downloading (through its satellites) software enhancements." (Exhibit F, at 7.)

**Additional Notice of Finisar's '505 Patent to DirecTV**

67.  Soon after the December 2003 issuance of DirecTV's '661 patent, in which it
disclosed and claimed "a first carousel of electronic program guide information that repeatedly
broadcasts a first set of electronic program information with a first periodicity and a second
carousel of electronic program guide information that repeatedly broadcasts a second set of
electronic program guide information with a second periodicity," and "wherein the first program
data is repeatedly broadcast at a first periodicity" and "wherein the second program data is
repeatedly broadcast at a second periodicity different from the first periodicity," Finisar
established direct contact with DirecTV's in-house attorneys.  The purpose of this contact was to
serve DirecTV with formal notice of its infringement of Finisar's '505 patent and to seek to
license the technology of the '505 patent to DirecTV.  In an attempt to avoid litigation, Finisar
wrote that "it would prefer to address the issue of DirecTV's use of Finisar's intellectual
property rights in a licensing context rather than through more formal means."

68.  On January 29, 2004, Finisar sent a letter to defendant DirecTV, Inc.'s General
Counsel ("DirecTV Counsel") offering to license DirecTV the technology claimed in the '505
patent and providing DirecTV notice of its infringement of the '505 patent. (Letter from
Williams to Hall of 01/29/04, at 1–2, a true and correct copy is attached hereto as Exhibit N.)

69.  DirecTV Counsel failed to respond until March 17, 2004, stating that he would
"review the matters" raised in the January 29, 2004 letter.  (Letter from Crook to Williams of
3/17/04, at 1, a true and correct copy is attached hereto as Exhibit O.)

70.  On March 22, 2004, Finisar again sent a letter to DirecTV Counsel providing notice
of infringement.  Specifically, Finisar stated: "[Consistent with] our previous letter, we believe

14

that DirecTV has been using Finisar's intellectual property for some time. . . . We are now in possession of additional information which we believe shows that DirecTV is and has been using technology covered by the '505 patent in DirecTV's [electronic] program guide broadcast, for example." Furthermore, Finisar again offered to resolve the issue with a licensing arrangement under the '505 patent. (Letter from Williams to Crook of 3/22/04, at 1, a true and correct copy is attached hereto as Exhibit P.)

71.  DirecTV Counsel responded on March 29, 2004, claiming that he had initiated a review of the matter and representing that he would "take every reasonable step to expedite [his] review." (Letter from Crook to Williams of 3/29/04, at 1–2, a true and correct copy is attached hereto as Exhibit Q.)

72.  Almost four months later, and still lacking a response from DirecTV, Finisar again notified DirecTV of its infringement through correspondence dated July 23, 2004 and yet again requested that DirecTV engage in a licensing dialogue for a license under the '505 patent. (Letter from Williams to Crook of 7/23/04, at 1, a true and correct copy is attached hereto as Exhibit R.)

73.  Notwithstanding Finisar's repeated attempts to engage DirecTV in a substantive licensing discussion to cure DirecTV's infringement, DirecTV refused to confront the issue or provide Finisar with a response, all in furtherance of its dilatory tactics.  Lacking any response from DirecTV, Finisar wrote again on October 7, 2004 seeking DirecTV's position in the matter. (Letter from Williams to Crook of 10/7/04, at 1, a true and correct copy is attached hereto as Exhibit S.)

74.  DirecTV ignored Finisar's October 7, 2004 correspondence.

75.  By letter dated January 21, 2005, counsel for Finisar wrote to DirecTV Counsel. That letter reviewed the history of Finisar's recent contacts with DirecTV, specifically noting the January 29, 2004 letter to Robert M. Hall of DirecTV, Inc.  Almost a full year had then passed since this initial letter to which DirecTV Vice President and associate General Counsel of Intellectual Property had responded that he would "get back to [Finisar] promptly." (Letter from Williams to Crook of 1/21/05, at 1–2, a true and correct copy is attached hereto as Exhibit T.)

76.  After detailing the history of Finisar's attempts to engage DirecTV in a licensing discussion, with reference to all of the correspondence provided by Finisar, Finisar yet again expressed that it "would very much like to begin a dialog with DirecTV on the matter." As before, Finisar's requests were ignored. *Id.*

77.  To date, DirecTV has failed to give Finisar any form of a substantive answer regarding Finisar's claims of patent infringement and offer to license the '505 patent.

78.  Finisar was finally forced to file this action to seek reparations for DirecTV's willful infringement of its patented technology.

### FIRST CLAIM FOR RELIEF
### Infringement of United States Patent No. 5,404,505 by all Defendants

79.  Finisar hereby incorporates, as though fully set forth herein, the allegations of paragraphs 1 through 78 of this Complaint.

80.  DirecTV and Hughes have infringed and continue to infringe the '505 patent by making, using, selling, offering for sale within the United States or importing into the United States systems and/or methods that embody one or more of the claims of the '505 patent, or by contributing to infringement, inducing others to infringe the '505 patent, or carrying out acts

constituting infringement under 35 U.S.C. § 271(f). Such infringing conduct includes, but is not limited to, the transmission of at least a portion of DirecTV programming.

81. Finisar has given notice to DirecTV and Hughes of the '505 patent.

82. DirecTV and Hughes' infringement of the '505 patent is, has been, and continues to be willful and deliberate.

83. DirecTV and Hughes will continue to infringe the '505 patent unless enjoined by this Court, which has resulted and will continue to result in irreparable harm to Finisar.

84. As a direct and proximate result of DirecTV and Hughes' infringement of the '505 patent, Finisar has been and continues to be damaged in an amount yet to be determined.

## PRAYER FOR RELIEF

WHEREFORE, Finisar prays for judgment against DirecTV and Hughes as follows:

A.      For a judgment holding DirecTV and Hughes liable for infringement of the '505 patent;

B.      For an award of damages adequate to compensate Finisar for DirecTV and Hughes' infringement of the '505 patent, including treble damages and other damages allowed by 35 U.S.C. § 284;

C.      For injunctive relief enjoining DirecTV and Hughes, their officers, agents, servants, employees and attorneys and all other persons in active concert or participation with them as follows:

(i)      from manufacturing any products or providing any services falling within the scope of the claims of the '505 patent;

17

(ii)     from using any product, method or providing services falling within the scope of any of the claims of the '505 patent;

(iii)    from selling, offering to sell, licensing or purporting to license any product, method or offering services falling within the scope of any of the claims of the '505 patent;

(iv)     from importing any product into the United States which falls within the scope of the '505 patent;

(v)      from actively inducing others to infringe any of the claims of the '505 patent;

(vi)     from engaging in acts constituting contributory infringement of any of the claims of the '505 patent; and

(vii)    from all other acts of infringement of any of the claims of the '505 patent;

D.     That DirecTV and Hughes be ordered to deliver up for destruction all infringing products in their possession;

F.     That this be declared an exceptional case and that Finisar be awarded its attorneys fees against DirecTV and Hughes pursuant to 35 U.S.C. § 285;

G.     For an award of Finisar's costs of this action; and

H.     For such further relief as this Court deems Finisar may be entitled to in law and in equity.

## JURY DEMAND

Finisar hereby demands a trial by jury of those issues triable to a jury.

DATED this 4th day of April, 2005.

18

**GERMER GERTZ, L.L.P.**

550 Fannin, Suite 500
Beaumont, Texas  77701
(409) 654-6700 - Telephone
(409) 838-4050 - Telecopier

By: _____   *by permission*
                                 *H. Craig Hall*
        Lawrence Louis Germer
        Attorney in Charge
        State Bar No. 07824000
        e-mail: llgermer@germer.com

        H. Craig Hall
        State Bar No. 24012768
        e-mail: hchall@germer.com

**WORKMAN NYDEGGER**

1000 Eagle Gate Tower
60 East South Temple
Salt Lake City, Utah  84111
(801) 533-9800 - Telephone
(801) 321-1707 - Facsimile

        Larry R. Laycock (Utah Bar No. A4868)
        e-mail:  llaycock@wnlaw.com
        David R. Wright (Utah Bar No. A5164)
        e-mail:  dwright@wnlaw.com
        Charles L. Roberts (Utah Bar No. A5137)
        e-mail:  croberts@wnlaw.com
        Eric Maschoff (Utah Bar No. A6608)
        e-mail:  emaschoff@wnlaw.com
        C.J. Veverka (Utah Bar No. A7110)
        e-mail:  cveverka@wnlaw.com

Attorneys for Plaintiff FINISAR CORPORATION

J:\163131\Init filings & Press\Complaint 2.doc–

JS 44  (Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Finisar Corporation

## DEFENDANTS

The DirecTV Group, Inc.; DirecTV Holdings, LLC; DirecTV Enterprises, LLC; DirecTV Operations, LLC; DirecTV, Inc., and Hughes Network Systems, Inc.

(b) County of Residence of First Listed Plaintiff   Santa Clara County
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed   Los Angeles County
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
Lawrence Louis Germer
Germer Gertz, L.L.P.
550 Fannin, Ste. 500
Beaumont, TX 77701
(409) 654-6700

Attorneys (If Known)

1:05CV0264

*[Stamp: RECEIVED APR 4 2005 CLERK, U.S. DISTRICT COURT EASTERN DIST. OF TEXAS]*

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

- ☐ 1  U.S. Government Plaintiff
- ☐ 2  U.S. Government Defendant
- X 3  Federal Question
  (U.S. Government Not a Party)
- ☐ 4  Diversity
  (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)   and One Box for Defendant)

|  | PLF | DEF |  | PLF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | ☐ 423 Withdrawal | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury — | of Property 21 USC | 28 USC 157 | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 820 Copyrights | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | X 830 Patent | ☐ 810 Selective Service |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | Exchange |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | | ☐ 875 Customer Challenge |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | **SOCIAL SECURITY** | 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| | Injury | | | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt.Reporting | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | & Disclosure Act | | Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | Habeas Corpus: | | ☐ 870 Taxes (U.S. Plaintiff | Under Equal Access to |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | or Defendant) | Justice |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc. | ☐ 871 IRS—Third Party | State Statutes |
| | | ☐ 550 Civil Rights | Security Act | 26 USC 7609 | ☐ 890 Other Statutory Actions |
| | | ☐ 555 Prison Condition | | | |

## V. ORIGIN   (PLACE AN "X" IN ONE BOX ONLY)

- X 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from another district (specify)
- ☐ 6  Multidistrict Litigation
- ☐ 7  Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
(Cite the U.S. Civil Statute under which you are filing and write brief statement of cause.
Do not cite jurisdictional statutes unless diversity.)
Finisar alleges that the Defendants have infringed and continue to infringe U.S. Patent No. 5,404,505 under 35 U.S.C. §§271, 281, 283, 284 and 285.

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   X Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):
JUDGE

DOCKET NUMBER

DATE

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY