1

1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF TEXAS
2         BEAUMONT DIVISION

                                              ~F I L E D~
                                       U.S. DISTRICT COURT
                                    EASTERN DISTRICT OF TEXAS

3  FINISAR CORPORATION, A    *  DOCKET 1:05CV264    JUN 3 0 2006
   DELAWARE CORPORATION      *
4                            *                  DAVID J. MALAND, CLERK
   V.                        *                  DEPUTY
5                            *
   THE DIRECTV GROUP, INC.,  *
6  A DELAWARE CORPORATION;   *  JUNE 21, 2006
   DIRECTV HOLDINGS, LLC, A  *
7  DELAWARE LIMITED LIABILITY *
   COMPANY; DIRECTV          *
8  ENTERPRISES, LLC, A       *
   DELAWARE LIMITED LIABILITY *  4:16 P.M.
9  COMPANY; DIRECTV OPERATIONS*
   LLC, A CALIFORNIA LIMITED *
10 LIABILITY COMPANY; DIRECTV,*
   INC., A CALIFORNIA        *
11 CORPORATION; AND HUGHES   *
   NETWORK SYSTEMS, INC., A  *
12 DELAWARE CORPORATION      *  BEAUMONT, TEXAS
   -----------------------------------------------------------
13
              VOLUME 1 OF 1, PAGES 1 THROUGH 34
14
                 REPORTER'S TRANSCRIPT OF
15                 JURY TRIAL EXCERPT
   DIRECT EXAMINATION OF ROY GRIFFIN BY MR. GERMER
16
            BEFORE THE HONORABLE RON CLARK
17           UNITED STATES DISTRICT JUDGE

18 -----------------------------------------------------------

19 ATTORNEYS OF RECORD:

20 FOR THE PLAINTIFF:        C.J. VEVERKA
                            CHARLES L. ROBERTS
21                          KIRK R. HARRIS
                            LARRY R. LAYCOCK
22                          DAVID R. TODD
                            MARK W. FORD
23                          DAVID R. WRIGHT
                            WORKMAN, NYDEGGER & SEELEY
24                          1000 EAGLE GATE TOWER
                            60 EAST SOUTH TEMPLE
25                          SALT LAKE CITY, UTAH  84111

311

2

1

2  FOR THE PLAINTIFF (CONT'D):    LAWRENCE L. GERMER
                                 H. CRAIG HALL
3                                GERMER GERTZ
                                 550 FANNIN ST., SUITE 500
4                                BEAUMONT, TEXAS  77701

5

6  FOR THE DEFENDANTS:           J. THAD HEARTFIELD, JR.
                                 HEARTFIELD & MCGINNIS
7                                2195 DOWLEN ROAD
                                 BEAUMONT, TEXAS  77706

8

9                                VICTOR G. SAVIKAS
                                 STEVEN J. CORR
10                               LOUIS L. TOUTON
                                 MARSHA E. MULLIN
11                               ALLEN JANSEN
                                 GREG CASTANIAS
12                               MARIA K. NELSON
                                 KEVIN MCBRIDE
13                               JONES DAY - CALIFORNIA
                                 555 S. FLOWER STREET, 50TH FLOOR
14                               LOS ANGELES, CALIFORNIA  90071

15

16

17

18

19

20

21

22

23

24      PROCEEDINGS REPORTED USING COMPUTERIZED STENOTYPE;
        TRANSCRIPT PRODUCED VIA COMPUTER-AIDED TRANSCRIPTION.
25

1           [COURT REPORTER'S NOTES FINISAR V.

2   DIRECTV\GRIFFIN'S 6-21 TESTIMONY, 4:16 P.M., WEDNESDAY,

3   JUNE 21, 2006, BEAUMONT, TEXAS, JUDGE CLARK PRESIDING.]

4           [OPEN COURT, ALL PARTIES PRESENT, JURY PRESENT.]

5           THE COURT:  You recall, sir, you are still under

6   oath.

7           THE WITNESS:  Yes, sir.

8           DIRECT EXAMINATION OF ROY GRIFFIN

9   BY MR. GERMER:

10  Q.    Would you state your full name once again for the record,

11  please?

12  A.    Roy Allen Griffin, III.

13  Q.    Mr. Griffin, the jury has been hearing the last day or

14  so, in effect, comparisons between the '505 patent and what is

15  called prior art.  We're now going back to the infringement

16  case; so, we're going to be talking about, as you talked about

17  before, the '505 patent and the question about whether or not

18  what DIRECTV does infringes.  Is that correct?

19  A.    That's right.

20  Q.    Were you in attendance here in this courtroom when

21  Dr. Rinard testified?

22  A.    Yes, I was.

23  Q.    And were you in attendance in the courtroom when

24  DIRECTV's engineers testified several days ago?

25  A.    Yes.

1    Q.    I've got a couple of general questions for you. Did you

2 get the impression that Dr. Rinard was stating, in part, that

3 the '505 patent does not involve satellite television?

4    A.    I did get that impression from him.

5    Q.    Well, do you agree with his contention that it doesn't

6 involve satellite television?

7    A.    No, not at all.

8    Q.    Could you explain that?

9    A.    Well, the patent itself speaks of a broadcast system and

10 broadcast by satellite; and you can see lots of references in

11 this specification of the '505 patent that relate to

12 television, as well. So, it would be a natural mix of

13 broadcasting and television from the specification to lead us

14 to a place where we would consider that television would be

15 part of what you were interested in in this patent.

16    Q.    Let me direct your attention to Plaintiff's Exhibit 2 at

17 Column 16. Can you identify this as a portion of the '505

18 patent?

19    A.    Yes. I do see that.

20    Q.    And do you see at the top where it talks about video

21 programming?

22    A.    Yes, that's right.

23    Q.    And without going through this complete subject, can you

24 see at the bottom it goes off the page and continues on to the

25 next page?

5

1  A.    Right.  Columns 16 and 17 both deal quite a bit with

2  video and the way that video is handled.

3  Q.    And when it is talking about video programming, is that

4  the same as television programming?

5  A.    Yes, essentially the same.

6  Q.    Now, is this the only place in the '505 patent that talks

7  about video or television programming?

8  A.    No.  There are a number of places in the patent where it

9  talks about video and television programming and -- as part of

10 this transmission system.

11 Q.    I think I heard Dr. Rinard compare the '505 patent to the

12 internet.  Did you hear him make that statement?

13 A.    Yes, I did.

14 Q.    Could you comment on that?

15 A.    Well, I think the relationship between this patent and

16 the internet is much more tenuous than the relationship between

17 this patent and, say, satellite television.

18          The internet is a query system, like is shown in

19 the prior art examples that are in the '505 patent where you

20 ask for something and then you get something back; and it has

21 to individually process all of the requests.

22          Here we're talking about a broadcast system, much

23 like DIRECTV, where you are broadcasting information to a great

24 number of subscribers all at one time.

25 Q.    All right.  Thank you.

1    As you were listening to Dr. Rinard, do you recall

2 how many times he referred to technical documents of DIRECTV to

3 justify or support his conclusions?

4 A.    I think maybe once or twice.

5 Q.    Do you recall him ever quoting or using testimony from

6 the DIRECTV engineers to support his conclusions or opinions?

7 A.    I don't recall that, no.

8 Q.    Were you surprised by this?

9 A.    Well, I was somewhat because it would seem that when you

10 are putting together an infringement or a non-infringement

11 case, you would want to be able to rely on documents that would

12 support that case or rely on the testimony of the engineers

13 that are actually part of DIRECTV.  So, it did surprise me a

14 bit.

15 Q.    Did you, in fact, listen to DIRECTV's engineers testify

16 about their own system, the DIRECTV system?

17 A.    Yes, here in this proceeding I did.

18 Q.    And did you hear Dr. Rinard talk about the DIRECTV

19 system?

20 A.    Yes.

21 Q.    What did you conclude from listening to that testimony

22 compared to yours?

23 A.    Well, I was really struck by the fact that there is a lot

24 of similarity.  When I was discussing the system with you-all,

25 I showed diagrams that were almost identical or, if not

1 identical, they had the same concepts as what was shown to you

2 by the engineers and also by Dr. Rinard. So, there is a lot

3 about this technology that we all agree on.

4 Q.    All right. Thank you very much.

5           Do you recall that Dr. Rinard put up at one point a

6 chart where he had eight points on there that he said showed

7 there was no infringement?

8 A.    Yes, I do.

9           MR. GERMER: I'd like for that to come up on the

10 screen.

11 BY MR. GERMER:

12 Q.    Is that the chart that you recall that Dr. Rinard used?

13 A.    That's -- yes, that's correct.

14 Q.    Now, do you agree with these reasons that Dr. Rinard sets

15 forth for saying that there's no infringement?

16 A.    No, not at all.

17 Q.    Now, what I want to do is quickly address each one of

18 these points and have you basically explain to the jury why

19 Dr. Rinard is wrong. I'm going to start with Number 1 at the

20 top. It says, "channels, not indexes."

21           Now, does DIRECTV use indexes or channels?

22 A.    Well, quite frankly, DIRECTV uses both. It does use

23 channels, but it uses indexes in order to organize the

24 information that it's going to transmit on those channels. So,

25 the answer is yes. Channels, yes. Indexes, yes. And there's

1  no incongruity in that.  There is no reason why that shouldn't
2  be.
3  Q.    Well, he's setting it up -- Dr. Rinard is setting it up
4  as if it is a question of either/or, channels or indexes.  Is
5  that accurate?
6  A.    No, it is not.  It is not a matter of channels or
7  indexes.  Channels certainly can be there, and indexes are used
8  to get to the information in the channels.
9  Q.    Now, when we're talking about indexes, are we talking
10  about the program guides?
11  A.    We're talking about the program guides, yes, because
12  those provide all the information that the subscriber needs to
13  be able to get to the information that he needs, the programs
14  he wants to watch.
15  Q.    Is it your opinion that SCIDs, transponder numbers, and
16  satellite numbers are parts of the index that DIRECTV uses?
17  A.    Yes.
18  Q.    And is it your opinion that this same information is
19  transmitted in DIRECTV's program guide?
20  A.    Yes, it is.
21  Q.    I want to direct your attention to Plaintiff's
22  Exhibit 612 at DTVI 14416.  This is actually an exhibit to the
23  deposition of a John Godwin in an International Trade
24  Commission proceeding.  If we've got it up there with the
25  highlighted part, could you read that to the jury and explain

1  what it says?

2  A.    Under B it says, "SCID index (to address the PIP map,

3  which is a list of PIP SCIDs)."  And then you can see where it

4  says "SCID index" in the little chart there, as well.

5  Q.    All right.  Let me direct your attention to the

6  deposition of Robert Arsenault that was taken February 10th,

7  2006.  Were you present at his deposition?

8  A.    Yes, I was.

9  Q.    I want to show you from his deposition page 21, lines 8

10  through 10.  Could you read that and comment on that?

11  A.    The question is, "So, what is the index that you are

12  referring to in that answer?"

13         And he answers, "That was the transponder index."

14         So, now we've seen actually two references.  One

15  talks about the SCID as an index.  Now we've seen something

16  that talks about this transponder as an index, as well.

17  Q.    Let me direct your attention to another DIRECTV

18  specification.  This is Plaintiff's Exhibit 705 at page 13.

19  This is dealing with set-top boxes.  Will you please read the

20  highlighted portion of that exhibit?

21  A.    Here, at 4.10.2, it says "Satellite Index"; and then it

22  says, "The satellite index is defined by the following list."

23  And you can see satellite identifiers on the left, which

24  satellite it's talking about.  And this is a place where they

25  are talking about a satellite index and a satellite I.D. being

1 a satellite index.

2 Q.    So, by looking at just these documents from DIRECTV, what

3 can you tell the jury about whether DIRECTV uses indexes, by

4 their own terms, to organize its database?

5 A.    I conclude they do.  They use -- by their own terms, they

6 are using indexes both in the satellite index, the transponder

7 index, and the SCID index.

8 Q.    So, then, let's go back to Dr. Rinard's chart.  Is his

9 first point accurate?

10 A.    No, it's not accurate.

11 Q.    Can we, then, cross that out?  Would that be okay?

12 A.    Yes.  That would be a good idea.

13 Q.    All right.  We're going to cross out the next one, too.

14 We'll get there but...

15        All right.  Well, let's go to the next one and see

16 if we can cross it out.

17        The second point is he says that the television

18 guide has no scheduled transmission time.  You see that up

19 there, I'm sure.

20 A.    Yes, I do.

21 Q.    Do you agree with that conclusion?

22 A.    No, I don't.

23 Q.    Why not?

24 A.    Well, first of all, the DIRECTV documentation talks about

25 how they build a new schedule every 30 minutes so that they can

1  update their program guide. And even Dr. Rinard refers to

2  something as a scheduled update time.

3         To me, a scheduled update time is what he's talking

4  about as a scheduled transmission time. It is just another way

5  of saying it.

6  Q.  And to remind the jury, this guide, is it transmitted

7  every 30 minutes, a new guide?

8  A.  A new guide is built and transmitted every 30 minutes,

9  and then it is transmitted every 4 seconds during that

10  30-minute time period between those two 30-minute intervals.

11  Q.  Okay, thanks.

12         I want to direct your attention to the deposition

13  of Robert Arsenault at page 10, line 16 to 20. Can you read

14  that, please, to the jury?

15  A.  It says, "And the next field over, XMIT equals that long

16  number. What is that field used for?"

17         And his answer is, "It is the transmission time for

18  putting into activity this stream list, and that long number is

19  a Greenwich timestamp."

20  Q.  Now, that's a little complicated. What does that mean?

21  A.  Yeah, it is a little complicated. But what it means is

22  they have a timestamp on this stream list that indicates the

23  transmission time for putting this program guide into

24  activation.

25  Q.  All right. Thank you.

1    Now, assume for a moment that assigning an updated

2 time and then transmitting it a short time later is not the

3 same thing as a scheduled transmission time.  Does that mean

4 that DIRECTV does not infringe?

5 A.    No, it doesn't.

6 Q.    Why not?

7 A.    Because under the doctrine of equivalents, there will be

8 substantial similarity --

9    MR. TOUTON:  Objection, your Honor.  This goes

10 beyond the scope of his expert report and also beyond the scope

11 of DIRECTV's case-in-chief.

12    MR. GERMER:  Your Honor, if I could --

13    THE COURT:  Well, he -- the statement he has made

14 so far is the same as made before; so, I'll allow it.  However,

15 I think we've discussed before that that's basically what his

16 report says.

17    MR. GERMER:  Yes, sir.

18    THE COURT:  That's about the limit of what his

19 report said.  That's the limit of what we've had so far --

20    MR. GERMER:  Yes, sir.

21    THE COURT:  -- as far as equivalents.

22    MR. GERMER:  And I was simply going to ask him to

23 explain why there would be equivalents.

24    Your Honor, that is covered in his report.

25 Actually, it was covered in Dr. Rinard's report.  It was

1  covered generally in his opening up testimony.

2          THE COURT:  You can ask the next question; and it

3  starts getting into it, I mean, you can --

4          MR. TOUTON:  Your Honor --

5          THE COURT:  We understand the limitations that are

6  in the report.

7          MR. TOUTON:  I am concerned that I heard this

8  question and answer to be directed to a particular element

9  which was not in his report.

10          THE COURT:  Go ahead with your next question,

11  counsel.

12          MR. GERMER:  Yes, sir.

13  BY MR. GERMER:

14  Q.    Could you explain, under the doctrine of equivalents, why

15  it wouldn't make any difference?

16  A.    Having a scheduled update time and a --

17          THE COURT:  Okay.  That is going to a specific

18  claim, and I will sustain the objection.

19          MR. GERMER:  Your Honor, we had -- on four of these

20  points -- Dr. Rinard presented eight points; and, you know, he

21  puts them up here.  He talks about not infringing so --

22          THE COURT:  Okay.  Unfortunately -- and we've gone

23  through this before -- Mr. Griffin did not go into this in his

24  report.  He chose to limit this area of his report to one

25  paragraph of a couple sentences.  And, basically, if he had

1 wanted to go into that or had thought of it when he was writing

2 his report, he could have developed it.

3       I've allowed him to say what was in his report.

4 He's done that once before.  I'll allow him to say it again.

5 But I don't think it is proper for him now, after Dr. Rinard

6 has been dismissed, to come out with something entirely new

7 that he had never put in his report before and, as far as I

8 know, was never stuck in his deposition, either.  That's the

9 basis for my ruling under the Rules of Procedure and the

10 scheduling rules and Orders of the Court.

11       MR. GERMER:  Thank you, your Honor.  And I will

12 then delete -- because I had some other more detailed

13 references on two or three other points.

14       THE COURT:  Okay.

15       MR. GERMER:  And I'll delete that.  But I would

16 tell the Court and opposing counsel.  Actually, on this

17 particular one, this was covered in his report.  As the Court

18 will recall, there was a supplemental report.  And part of it

19 was struck; part of it was not struck.  The part of the report

20 that was not struck included references to why there is

21 equivalents in this particular situation.  And I think it

22 refers specifically to building these guides, and the verbiage

23 is used.  This is the only one of the matters I was going to

24 bring up that is covered in the supplemental report.

25       THE COURT:  I'll sustain the objection.

1  BY MR. GERMER:

2  Q.    Based upon your testimony, then, about --

3              MR. GERMER:  If we can go back to Dr. Rinard's

4  list.

5  BY MR. GERMER:

6  Q.    Based upon your testimony, then, and your difference with

7  Dr. Rinard, shouldn't we strike not only Number 1 but also

8  strike Number 2?

9  A.    Yes.

10 Q.    Thank you.

11             Now, going into the third point, which is

12 Dr. Rinard said there's no indexes embedded in the TV

13 programming, what do you conclude about that?

14 A.    I conclude that that's not correct, either.

15 Q.    And could you explain that, please?

16 A.    Really, Number 3 harkens from Number 1.  Since Dr. Rinard

17 doesn't believe there are indexes, then he is saying, well, you

18 can't be possibly embedding indexes in TV programming.  We've

19 already demonstrated here in our discussion of Number 1 that

20 SCIDs are indexes and SCIDs are embedded in television

21 programming.

22 Q.    So, then, do you conclude that Dr. Rinard is wrong in

23 this Number 3?

24 A.    Yes, I do.

25 Q.    Then would it be appropriate to strike it out?

1 A.    Yes.

2            MR. GERMER:  Do that, please.

3 BY MR. GERMER:

4 Q.    Looking at Number 4, Dr. Rinard says "TV has top

5 priority, but repeats less frequently."

6            Now, I want to direct your attention to Plaintiff's

7 Demonstrative Exhibit Number 27.  Do you recognize this as

8 being the requirement of Step E in Claim 16, which is what

9 we're talking about?

10 A.    Yes, I do.

11 Q.    And do you see over there on the right, we have the step

12 plus the Court's construction?

13 A.    Yes, I do.

14 Q.    Using that as necessary, could you explain to the jury

15 why Dr. Rinard is wrong about saying that TV has top priority

16 but repeats less frequently?

17 A.    This claim is talking about priority in relation to

18 repetition rates, priority in terms of repetition rate.  What

19 we are talking about is the fact that information that needs to

20 be received more frequently in a set-top box has to be then

21 prioritized higher so that it is transmitted more frequently so

22 that the set-top box will get it more frequently.

23            Now, conversely, if information is not needed in

24 the set-top box to be provided so frequently, then it doesn't

25 have to be prioritized so highly.  It can be prioritized at a

1  low priority and repeated less frequently.

2            So, the concept here in this patent -- in this

3  claim of the patent is prioritize those things that the box

4  needs to receive repeatedly at a repetition rate that's high if

5  it needs to be received quickly or often and prioritize

6  information that doesn't need to get to the set-top box on an

7  interval basis at a lower priority.

8            Now, what we have here in the DIRECTV system is

9  television programming is not repeated frequently.  It is not

10  that it doesn't need to be received, but it doesn't need to be

11  repeated often.

12            In terms of the claim, we're talking about groups

13  of information, tiers, prioritized according to how frequently

14  they need to go out, how frequently they need to be received.

15  And television programming simply does not need to go out with

16  the frequency that, say, program guides need to, especially the

17  master program guide that gives you all the information you

18  need every four seconds to acquire the programs in the first

19  place.

20  Q.    All right.  Thank you.

21            Now let me direct your attention to Plaintiff's

22  Exhibit 2.  Do you recognize this document, which is actually

23  part of the '505 patent itself?

24  A.    Yes.

25  Q.    And I want to direct you to columns 14, lines 11 and 12

1  that have now been highlighted on the screen. Could you read

2  that for the jury, please, the highlighted portion?

3  A.    This is what I was talking about before. The

4  prioritization that we're talking about in this claim is

5  "prioritized in accordance with actual or expected subscriber

6  usage" the information needing to get to the box and that

7  information needing to get to it at a certain repetition rate.

8  And, so, that's what we're talking about here.

9  Q.    Well, Dr. Rinard says television has the higher priority.

10 A.    Well, he's mistaken. He seems to think that priority is

11 related to something other than the repetition rate priority

12 that we're talking about here, and he's just misconstrued the

13 claim language. And the priority that we're talking about here

14 is priority in relation to repetition rate, that priority which

15 is established by the need to have something repeated often.

16         And certainly television programming is repeated

17 much less often. In fact, turnaround programming isn't

18 repeated at all. So, television programming is much lower

19 priority in terms of repetition rate than program guides and

20 other information.

21 Q.    Well, then, let's go back to his chart, Dr. Rinard's

22 chart. Would it be appropriate, then, to strike out the fourth

23 line about TV having top priority?

24 A.    Yes.

25 Q.    Thanks.

1    Let's go to the fifth point where Dr. Rinard says

2  there's no timestamps as required by Claims 17 and 39.  And

3  this point, of course, just deals with 17 and 39.  What have

4  you been able to conclude here?

5  A.    Well, I've been able to conclude that certainly DIRECTV

6  has timestamps; and looking at the Claims 17 and 39, those

7  timestamps are fully in compliance with the requirements of

8  those claims.

9  Q.    Mr. Griffin, assuming for a moment that Claims 17 and 39

10 require that there is timestamp information in the indexes that

11 tell you when program guide information will arrive, does that

12 mean that DIRECTV does not infringe?

13 A.    No.

14 Q.    And why not?  Just answer generally under the Court's

15 instructions why not.

16 A.    Even if the program guide required time stamps, what they

17 are doing is substantially similar.

18         MR. TOUTON:  Objection, your Honor.

19         THE COURT:  Okay.  And I will sustain that.

20         Ladies and gentlemen, you will disregard any

21 reference to "substantially similar."  This is not properly set

22 out in the report as it was supposed to be.

23         Mr. Griffin, you've heard my rulings.  Stick to

24 what was in your report, and stick to what we're going on here.

25 Do not keep trying to get into similar, whatever.  That is not

1 permissible.

2        MR. GERMER:  And, your Honor, I apologize.  I

3 thought the Court had ruled we could talk generally but I

4 couldn't go into specifics.

5        THE COURT:  Well, generally about all of them but

6 not on any particular claim.

7        MR. GERMER:  Okay.

8        THE COURT:  I mean, generally -- he's made his

9 general statement.  At the end if you want to talk about

10 generally, that's fine, but not in regards to a specific claim

11 as there was no reference to that in the original report.  It

12 is not bring it up when there has been no chance to go into

13 that.

14        MR. GERMER:  Thank you, your Honor.  I'll try to

15 get it right.

16 BY MR. GERMER:

17 Q.    Based on what you've told us about your evaluation of the

18 no timestamps, would it be appropriate, then, to strike that

19 contention of Dr. Rinard?

20 A.    Yes.

21        MR. GERMER:  And can we do that?

22 BY MR. GERMER:

23 Q.    Going to the next point, Number 8, which is "no reserved

24 bandwidth," do you agree with Dr. Rinard's contention in this

25 regard?

1  A.    No, I don't.

2  Q.    I want to direct your attention to Plaintiff's

3  Demonstrative Exhibit 34. Do you recognize this as the first

4  element of Claim 22, which is actually what we're talking about

5  here, along with the Court's construction?

6  A.    Yes.

7  Q.    Now, using the claim and the Court's construction, can

8  you describe why you don't agree with Dr. Rinard on this

9  bandwidth issue?

10  A.    Dr. Rinard's opinion seems to be based on the assumption

11  that setting aside bandwidth for transmission requires not only

12  that you set it aside but that you set it aside exclusively and

13  use it for the transmission that you have set aside for.

14         But if you look at the claim language and you look

15  at the Court's claim construction, there is no such language

16  that would indicate that.

17  Q.    So, then, as you would understand this claim, is there

18  bandwidth reserved in accordance with these claims?

19  A.    Yes.

20  Q.    What about the argument that DIRECTV does reserve

21  bandwidth but they might use a little bit more or a little bit

22  less perhaps than they had planned?

23  A.    Again, that's going to the same issue about whether the

24  exclusive -- setting aside is an exclusive thing. And they may

25  have equipment that would cause the bandwidth allocations to

1 change ever so slightly over periods of time or in real-time to

2 handle peak loads, but that doesn't get around the fact that

3 they have still set aside bandwidth for that purpose.

4 Q.    I want to direct you to the deposition of Richard

5 Purpura, one of the DIRECTV engineers; and I want to direct

6 your attention to page 66 at lines 18 to 24.  Could you read

7 that for the jury, please?

8 A.    The question is, "Well, that describes for me how CNN

9 gets assigned to a transponder.  What about all the other

10 content that is broadcast?"

11        And Mr. Purpura answers, "The bit rate allocation

12 process allocates all of our bandwidth, or at least most of our

13 bandwidth, to all of the services that we carry."

14 Q.    And then in the same deposition, I want to direct your

15 attention to page 74, lines 22 and 23.  Can you read that for

16 the jury, please?

17 A.    It says, "The bit rate allocation process has allocated a

18 particular transponder for each service."

19 Q.    Now, in addition to what you've said about channels, what

20 does this tell us?

21 A.    What this is talking about is, there's a whole group of

22 channels that are dedicated to a transponder.  Now, in this

23 case the transponder doesn't have this borrowing idea in place

24 where somebody could take a little bandwidth from one

25 transponder and use it on another transponder.

1 　　　　So, here we have an allocation process that
2 allocates bandwidth on a transponder to services in just the
3 manner that the claim requires.  Even if you take into
4 consideration a thought that it has to be set aside
5 exclusively, in this case it is.
6 Q.　　So, then, does DIRECTV allocate bandwidth by channel?
7 A.　　They do.
8 Q.　　Do they allocate bandwidth by transponder?
9 A.　　They do.
10 Q.　　Would it then be appropriate to strike out Dr. Rinard's
11 sixth point when we get it back up on the...
12 A.　　Yes.
13 Q.　　Thank you.
14 　　　　Going to the seventh argument that Dr. Rinard
15 throws out, he says that there's no DIRECTV set box that
16 receives all transmitted data packets.
17 　　　　I want to direct your attention to Plaintiff's
18 Demonstrative Exhibit 39.  Do you recognize this as the second
19 element of Claim 26, and Claim 26 is the claim that his
20 argument is directed to?
21 A.　　Yes.
22 Q.　　Using that claim language as you need to, could you
23 explain to the jury your opinion about Dr. Rinard's testimony?
24 A.　　Claim 26 has a lot to do with what the subscriber station
25 does with the packets that it receives and how it goes about

1 filtering those packets and stores in filter lists, some filter

2 data, and then downloads or forwards data packets from the

3 buffer to a predefined destination. The clear intent here is

4 to define more succinctly how the packets are dealt with.

5          But the second part here says "whereby each

6 subscriber station receives all transmitted data packets."

7 What Dr. Rinard seems to be saying is that word "all" is not

8 fulfilled, and here's why. He's saying that sometimes DIRECTV

9 is transmitting some information to San Francisco, like their

10 local San Francisco stations; and he's transmitting other

11 information to New York City for New York City's stations. And

12 people in New York City, obviously, don't get the transmissions

13 that go to San Francisco; and the San Franciscans don't get the

14 transmissions that go to New York City. So, how could the box

15 receive all of DIRECTV's transmitted data?

16          Well, the problem with that is what this claim is

17 talking about is receiving all transmitted data packets that

18 are transmitted to the set-top box intended for that set-top

19 box. The people in San Francisco certainly get all of the

20 information that's transmitted in San Francisco, and the people

21 in New York get all of the information that's transmitted in

22 New York.

23          So, I think he's misinterpreted this to think that

24 you can get around the patent by simply transmitting something

25 to Timbuktu where no subscriber station is going to receive it

1 and now you are no longer infringing the claim. And I think it

2 is a misreading of the claim.

3 Q.    Can I assume from what you said that you disagree with

4 him, then, on this point?

5 A.    Yes.

6 Q.    Would it be appropriate, then, to strike out Number 7?

7 A.    Yes.

8 Q.    All right. Going to the eighth and last point,

9 Dr. Rinard says that there is no reserved transmission times,

10 and he's referring there to Claim 44. What do you conclude as

11 to his statement here?

12 A.    Well, that is not true on the face of it. DIRECTV

13 reserves transmission times for programming. He seems to have

14 two arguments. One argument is a little convoluted and I don't

15 know if I will be saying it exactly correctly, but this is how

16 I understood it. He seemed to say that if you are scheduling

17 something for transmission on Disney at 7:00, you couldn't

18 schedule for transmission at 7:00 on some other channel. Now,

19 that one doesn't make a lot of sense; so, I don't know if I

20 just misinterpreted it.

21        But the second thing that he is saying is if I'm

22 scheduling programs for transmission at 7:00, then if a program

23 gets preempted, it might be possible for it to be preempted.

24 So, now I'm not reserving transmission time at that time

25 because, you know, the President came on and they were really

1 trying to do "Larry King Live" but they had to preempt "Larry

2 King Live" and then put the President on. And I just don't see

3 that to be reserving transmission times in the context of this

4 claim in a reasonable interpretation of this claim.

5 Q. All right. Then would it be appropriate to cross out

6 this last one, "no reserved transmission times"?

7 A. Yes.

8 Q. And since we've crossed them all out, would it be

9 appropriate to go back to the top and cross out the "not"?

10 A. Yes, because these are reasons why DIRECTV does infringe,

11 that all of these arguments against infringement are just not

12 valid.

13 Q. Thank you.

14      One question, then, about the doctrine of

15 equivalents. As you have testified before, would the doctrine

16 of equivalents have application to these claims?

17 A. Yes.

18 Q. Thank you.

19      A couple of questions about noninfringing

20 alternatives. Now, recall that goes to the point of could

21 DIRECTV in 1995 have done something else some other way, did

22 they have some other feasible way to operate without using this

23 patent.

24      Do you recall that you told the jury a few days

25 ago -- well, what did you tell them about whether or not there

1  were any noninfringing alternatives available?

2  A.    I told them that I knew of no noninfringing alternatives

3  that would be available at the time.

4  Q.    And did you hear Mr. Donaldson talk briefly about

5  noninfringing alternatives during his testimony?

6  A.    I did.

7  Q.    Did you hear him -- after hearing his testimony, has your

8  opinion changed?

9  A.    No, it hasn't at all.  I still believe there were no

10 viable noninfringing alternatives in 1995, or even now for that

11 matter.

12 Q.    Did you hear Mr. Donaldson say that someone told him that

13 an aperiodic transmission could be a viable noninfringing

14 alternative?

15 A.    I heard them say that, yes.

16 Q.    And what's your comment there?

17        MR. TOUTON:  Objection, your Honor.  This goes

18 beyond the scope of his expert report.

19        MR. GERMER:  Your Honor, I think the Court ruled on

20 that earlier and said we could go into that briefly.

21        THE COURT:  I'll sustain the objection.  Limit his

22 testimony to what's in his report.

23 BY MR. GERMER:

24 Q.    Mr. Griffin, is it your opinion that DIRECTV has

25 infringed each and every element of each and every claim that

1  we talked about in this case?

2  A.    The asserted claims in this case, yes.

3  Q.    Thank you very much.

4              CROSS-EXAMINATION OF ROY GRIFFIN

5  BY MR. TOUTON:

6  Q.    Mr. Griffin, let me ask you a few questions relating to

7  your testimony just now.  Do you agree with Professor Rinard

8  that the '505 patent describes a way to provide an improved

9  internet-like experience through use of broadcast media?

10 A.    I don't think so, no, sir.

11 Q.    So, you don't agree that it is an improvement over such

12 systems as Prodigy and CompuServe?

13 A.    No, I don't believe it is an internet-like service.

14 That's what I don't agree with.

15 Q.    Do you consider CompuServe and Prodigy to be

16 internet-like services?

17 A.    They are very ancient predecessors.

18 Q.    Of the internet?

19 A.    Of the internet.  I would say that's correct.

20 Q.    Okay.  And Dr. Levinson's patent was intended, as it

21 states in the patent, as an improvement over those items?

22 A.    Yes.

23 Q.    Okay.  Now, you discussed in your testimony just now a

24 transponder index.  Do you recall that?  You showed a table.

25 A.    Yes.

1 Q.    And wasn't that table describing what numbers were

2 assigned to the various transponders and frequencies that

3 DIRECTV uses?

4 A.    Now, I'm not sure.  Which table were you speaking of?

5 There was a SCID index table.

6 Q.    I'm speaking of the transponder index table.  Do you

7 recall that table?  You just testified about it.

8 A.    I don't recall the specific table you are speaking of.  I

9 saw a table that was a satellite index table --

10 Q.    All right.  Let's talk about that.

11 A.    -- if that's what you mean.

12 Q.    All right.  This satellite table -- index table, that was

13 about what satellites DIRECTV had and what numbers were

14 assigned to those satellites; is that correct?

15 A.    That's correct.

16 Q.    Let me turn, if I could now, to your testimony just now

17 about scheduled transmission times for the program guide.  And

18 I think I heard you say that a new program guide is transmitted

19 every 30 minutes.  Did you say that?

20 A.    What I was saying is that a new program guide needs to be

21 generated every 30 minutes, and then the transmission of that

22 guide will then occur.

23 Q.    And that has to occur -- and does that transmission

24 itself occur every 30 minutes?

25 A.    It occurs when it is scheduled by the stream list,

1  whenever that time is on the stream list.  Now, I don't know

2  what that time might be assigned to be; but it is assigned to

3  be something.

4  Q.    Well, isn't it your testimony, Mr. Griffin, that at least

5  some parts of the program guide take many hours to be

6  transmitted?

7  A.    That is with the -- with respect to the APG, there can be

8  carousels that take many hours.  However, there are also parts

9  of the APG, like the fast-load stream, that also repeat every

10  four seconds, just like the MPG does.

11  Q.    But your testimony is that even with respect to these

12  parts of the program guide that take several hours to transmit,

13  that they are transmitted every 30 minutes?

14  A.    No, sir.  What I'm saying is -- is that the portions of

15  the guide that require transmission -- because there are

16  changes, there are changes in what the transmission is -- those

17  portions will be updated every 30 minutes so that then the

18  transmissions will be accurate from that point.

19  Q.    And that transmission could occur many hours later,

20  correct?

21  A.    The transmission could occur many hours later, yes.

22  Q.    And, indeed, at the time of update, it is not possible to

23  determine when it will be transmitted out into the many hours

24  later?

25  A.    I think that is a deterministic value.  I think that can

1  be determined.  I don't know that I can determine it, but I

2  know the guide driver certainly would be able to determine when

3  that is going to occur.

4  Q.    It will determine it several hours from now when it has

5  time to transmit that; isn't that right?

6  A.    Well, as I said, it is deterministic.  The guide driver

7  certainly at some point in its processing is going to know at

8  what time that transmission is going to take place.

9  Q.    All right.  Let's talk, if we could, a bit about

10  repetition and priority.

11         MR. TOUTON:  And could I have Element E of Claim 16

12  put on the screen?

13         Thank you, Mr. Lodge.

14         And I want to highlight the last two lines and

15  beginning with "wherein" on the previous line.

16  BY MR. TOUTON:

17  Q.    Is it your testimony that -- at least the testimony I

18  heard is that your view is that priority has to be judged in

19  terms of the repetition rate.  Is that correct?

20  A.    Right.  That's correct.

21  Q.    So that, in your view, what has the most priority is what

22  is repeated most often?

23  A.    Well, no.  In my view what is repeated most often is

24  repeated most often because it has the highest priority.

25  Q.    All right.  But isn't it true that to determine the

32

1 priority, then, you don't just pay attention to the repetition

2 rate; you have to look at expected use by subscribers in the

3 view of the designer of the system?

4 A.    Certainly the expected use by subscribers, as we

5 discussed before, is a key way to determine the priority that

6 will be assigned to these pieces of information, these tiers,

7 these groups of data.  So, yes, certainly you would look at

8 that.

9 Q.    And isn't it also your view that in the DIRECTV system,

10 by your understanding and your opinion, that the turnaround

11 programming that DIRECTV is selling to its subscribers must

12 have the lowest priority?

13 A.    It has the lowest priority as regards repetition rate.

14 Q.    All right.  But --

15 A.    See, there can be many priorities in a system; but we're

16 talking about in this claim the repetition rate priority, why

17 you would want to repeat it.

18 Q.    In terms of expected usage, isn't it true that it's your

19 opinion that DIRECTV gives the lowest priority in terms of

20 expected usage to turnaround programming?

21 A.    In relation to the repetition rate, it is expected that

22 subscribers will not need turnaround programming repeated more

23 often than, say, program guide information.  Yes, that's right.

24 Q.    So, then, why -- isn't it also true, though, Mr. Griffin,

25 as Professor Rinard explained, that when DIRECTV is forced to

33

1  make a choice as to what to send, it will send turnaround

2  programming before it will send guide information?

3  A.    No, that's not what he said; and that's not really

4  accurate.

5          What he said is that in a place of contention where

6  you have a program guide packet and you have a video packet and

7  only one of those can go out, it will choose the video packet.

8  And that makes perfectly good sense, but it has nothing to do

9  with the repetition rate priority.

10  Q.    So, the higher-priority packet, in your view, is the one

11  that is thrown away; and the lower-priority packet is the one

12  that goes out.  Is that what you are saying?

13  A.    No.  We're not talking about at the packet level.  If I

14  could use an analogy, because maybe it would make things

15  easier.

16          If you're running a bus route every hour in a town

17  and you run a train through the town and the train runs once a

18  day and the bus route runs every hour and the bus driver is

19  told when you get to a railroad crossing, you yield to the

20  train.  That's what Dr. Rinard is basically talking about.  You

21  yield to the train -- that that means the train is in a

22  higher-priority repetition rate than the bus route, which is

23  not true.

24          See, the priority that's established for the train

25  to go through has no relationship to this claim language that's

1  dealing with how often the bus goes in its route or how often

2  the train runs.  They have no relationship to each other.

3  Q.    Will you agree, though, Mr. Griffin, that DIRECTV, when

4  it's forced to make a choice, throws the guide packets away, if

5  it has to, in order to send the video?

6  A.    If it has to, it would, yes.

7  Q.    All right.  Thank you.

8          [EXCERPT OF PROCEEDINGS CONCLUDED.]

9  COURT REPORTER'S CERTIFICATION

10          I HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT

11  TRANSCRIPT FROM THE RECORD OF PROCEEDINGS.

12  *Christina Bickham*                    JUNE 21, 2006

13  CHRISTINA L. BICKHAM, RMR, CRR

14

15

16

17

18

19

20

21

22

23

24

25